FILED
2026 Sep-30 PM 04:07
U.S. DISTRICT COURT
N.D. OF ALABAMA

**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| **LUCILE EDWARDS,** | } | |
| **Plaintiff,** | } | |
| **v.** | } | **Case No.: 2:25-cv-00558-MHH** |
| **RELIANCE STANDARD LIFE INSURANCE COMPANY,** | } | |
| **Defendant.** | } | |

## MEMORANDUM OPINION AND ORDER

This action arises under ERISA – the Employee Retirement Income Security Act of 1974 ~~action~~, 29 U.S.C. § 1001 et seq. Plaintiff Lucille Edwards seeks long-term disability benefits that she alleges defendant Reliance Standard Life Insurance Company wrongfully refused to provide. (Doc. 1). The parties have filed summary judgment motions. (Docs. 15, 16).

Rule 56 of the Federal Rules of Civil Procedure provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To demonstrate a genuine dispute, a party opposing a motion for summary judgment must cite "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions,

interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3). When a district court receives cross-motions for summary judgment, the court "must methodically take each motion in turn and construe all the facts in favor of the non-movant for each. If, after engaging in this analysis, the district court determines no genuine issue of material fact exists, then it may appropriately enter summary judgment for a party." *Thai Mediation Ass'n of Ala., Inc. v. City of Mobile, Ala.*, 83 F.4th 922, 926 (11th Cir. 2023).

***

ERISA "permits a person denied benefits under an employee benefit plan to challenge that denial in federal court." *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 108 (2008). ERISA was enacted to "promote the interests of employees and their beneficiaries in employee benefit plans, and to protect contractually defined benefits." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 113 (1989) (quotations and citation omitted). "[I]n an ERISA benefit denial case . . . the district court sits more as an appellate tribunal than as a trial court." *Curran v. Kemper Nat. Servs., Inc.*, No. 04-14097, 2005 WL 894840, at *7 (11th Cir. Mar. 16, 2005). "Review of the plan administrator's denial of benefits is limited to consideration of the material available to the administrator at the time it made its decision." *Blankenship v. Metro. Life Ins. Co.,* 644 F.3d 1350, 1354 (11th Cir. 2011).

The Eleventh Circuit provides a six-step framework for review of a plan administrator's benefits decision:

> (1) Apply the *de novo* standard to determine whether the claim administrator's benefits-denial decision is "wrong" (i.e., the court disagrees with the administrator's decision); if it is not, then end the inquiry and affirm the decision.
>
> (2) If the administrator's decision in fact is "*de novo* wrong," then determine whether he was vested with discretion in reviewing claims; if not, end judicial inquiry and reverse the decision.
>
> (3) If the administrator's decision is "*de novo* wrong" and he was vested with discretion in reviewing claims, then determine whether "reasonable" grounds supported it (hence, review his decision under the more deferential arbitrary and capricious standard).
>
> (4) If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds do exist, then determine if he operated under a conflict of interest.
>
> (5) If there is no conflict, then end the inquiry and affirm the decision.
>
> (6) If there is a conflict, the conflict should merely be a factor for the court to take into account when determining whether an administrator's decision was arbitrary and capricious.

*Blankenship*, 644 F.3d at 1355.

In the initial *de novo* review, Ms. Edwards bears the burden of proving that she is entitled to benefits. *See Glazer v. Reliance Standard Life Ins. Co.*, 524 F.3d 1241, 1247 (11th Cir. 2008). If Ms. Edwards succeeds, then she bears the burden of

establishing Reliance Standard's decision was "arbitrary and capricious." *Capone v. Aetna Life Ins. Co.*, 592 F.3d 1189, 1195–96 (11th Cir. 2010).

***

Lucile Edwards worked as a Clinical Nurse II at Alameda Health System until March 31, 2022. (Doc. 11-1, pp. 61, 116). She provided patient care. (Doc. 11-1, pp. 181–83).

Ms. Edwards was covered by the Alameda Health System Long-Term Disability Plan. (Doc. 11-1, pp. 1–2, 48). Reliance Standard Life Insurance Company administered the plan under Group Policy No. 669905. (Doc. 11-1, p. 2).

The Policy defines "Total Disability" as follows:

> "Totally Disabled" and "Total Disability" mean, that as a result of an Injury or Sickness:
>
> (1) during the Elimination Period and for the first 24 months for which a Monthly Benefit is payable, an Insured cannot perform the material duties of his/her Regular Occupation;
>
> (a) "Partially Disabled" and "Partial Disability" mean that as a result of an Injury or Sickness an Insured is capable of performing the material duties of his/her Regular Occupation on a part-time basis or some of the material duties on a full-time basis. An Insured who is Partially Disabled will be considered Totally Disabled, except during the Elimination Period;
>
> (b) "Residual Disability" means being Partially Disabled during the Elimination Period. Residual Disability will be considered Total Disability; and

> (2) after a Monthly Benefit has been paid for 24 months, an Insured cannot perform the material duties of Any Occupation. We consider the Insured Totally Disabled if due to an Injury or Sickness he or she is capable of only performing the material duties on a part-time basis or part of the material duties on a full-time basis.

(Doc. 11-1, p. 11).

On March 31, 2022, the day Ms. Edwards stopped working, she was evaluated by J. Lewis, LPT. (Doc. 11-2, pp. 43–44). Ms. Lewis noted that Ms. Edwards had anxiety and depression, racing thoughts, insomnia, high blood pressure, and severely impaired attention, concentration, and memory. (Doc. 11-2, p. 43). Ms. Lewis also noted "COVID issues at work – Understaff – Overwork." (Doc. 11-2, p. 43). Ms. Lewis noted Ms. Edwards had logical thought process, good insight into her illness, and no suicidal ideations. (Doc. 11-2, p. 43). Ms. Lewis recommended time off from work, exercise, time with friends, and relaxing activities like coloring books. (Doc. 11-2, p. 44). During the Elimination Period, Ms. Edwards attended Disability Counseling Services approximately twice per month. (Doc. 11-2, pp. 42–91). Tyda Viveros, LPT conducted most sessions. (Doc. 11-2, pp. 42–91).[1]

On February 1, 2023, Ms. Edwards filed a claim for long-term disability benefits with Reliance. (Doc. 11-1, p. 173). Nicole Joyce, LCSW, reviewed Ms.

[1] According to Reliance, the 180-day Elimination Period for Ms. Edwards's claim ran from March 31, 2022, through September 27, 2022. (Doc. 15, p. 4). Ms. Edwards argues that Reliance's statement "reflects its calculation rather than a record entry." (Doc. 20, p. 3).

Edwards's medical records for Reliance. (Doc. 11-1, pp. 56–57). On March 15, 2023, Reliance issued a letter in which the company stated that the documentation Ms. Edwards submitted did not sufficiently demonstrate a functional impairment, so Reliance denied her request for benefits. (Doc. 11-1, pp. 140–143). Reliance stated:

> While psychiatric symptoms are noted, the severity of clinical findings on file do not substantiate psychiatric symptoms that would preclude work function. There is no indication of restrictions and limitations for activities of daily living, self-care, or decision making. There is no formal assessment of cognitive complaints on file. Based on the available medical information, there is insufficient medical evidence to support the severity, duration, and frequency of psychiatric impairment that would preclude work function.

(Doc. 11-1, p. 141). Reliance did not conduct an in-person medical examination. (Doc. 11-1, pp. 140–143).

Ms. Edwards challenged the denial. (Doc. 11-1, p. 144; Doc. 11-2, p. 120). Reliance received updated records from Disability Counseling Services, including notes from Ms. Viveros that post-dated the Elimination Period. (Doc. 11-2, pp. 145–176). In an April 19, 2023 progress note, Dr. Sandra Smith observed that Ms. Edwards did "not appear to be motivated to [return to work]" and indicated that Ms. Edwards was not taking "Psych Meds." (Doc. 11-2, p. 150).

Reliance attempted to schedule an independent psychiatric evaluation but, after learning that Ms. Edwards had relocated to Alabama, obtained a file review from Dr. Brandon Erdos. (Doc. 11-1, p. 163). On August 11, 2023, Dr. Erdos issued

his report after unsuccessful attempts to contact Ms. Viveros. (Doc. 11-2, pp. 185–189).

On September 12, 2023, Reliance affirmed its earlier decision. (Doc. 11-1, pp. 156–165).

***

At the outset, the Court must determine whether Reliance's decision to deny long-term benefits to Ms. Edwards was *de novo* wrong. "A decision is wrong if, after a review of the decision of the administrator from a *de novo* perspective, the court disagrees with the administrator's decision." *Glazer,* 524 F.3d at 1246 (internal quotations and citation omitted). The Court "must consider, based on the record before the administrator at the time its decision was made, whether the court would reach the same decision as the administrator;" "[i]f the court determines that the plan administrator was right, the analysis ends and the decision is affirmed." *Glazer,* 524 F.3d at 1246–47 (citation omitted).

Under the Reliance plan, Ms. Edwards must prove that she was totally disabled during the Elimination Period. (*See* Doc. 11-1, p. 24) ("[Reliance Standard] will pay a Monthly Benefit if an Insured . . . submits satisfactory proof of Total Disability to [it]."). In her claim form, Ms. Edwards reported that she stopped working on March 31, 2022, because she was "diagnosed with anxiety and depression" and "fractured right foot on 10/18/2022." (Doc. 11-1, p. 174).

According to Reliance, Ms. Edwards's Elimination Period began on March 31, 2022, and concluded on September 27, 2022. (*See* Doc. 15, p. 4).

As an initial matter, the foot fracture does not support Ms. Edwards's claim for total disability. The fracture occurred on October 18, 2022, after the Elimination Period ended. (Doc. 11-1, p. 174). Because Ms. Edwards fractured her foot after the relevant period, Reliance properly denied disability benefits based on that injury.

With respect to her claimed disability based on anxiety and depression, Ms. Edwards argues that Reliance's denial rests almost entirely on a file review conducted by Dr. Erdos, a non-examining consultant. (Doc. 17, p. 10, ¶ 48). She emphasizes that Dr. Erdos did not evaluate her and asserts that his conclusions conflict with those of her treating providers. (Doc. 17, pp. 10–11, ¶ 49). According to Ms. Edwards, her providers consistently documented persistent cognitive impairment, psychiatric symptoms, pain, and fatigue that prevented her from safely resuming her nursing duties. (Doc. 17, pp. 10–11, ¶ 49). She contends that Reliance failed to meaningfully explain why it credited the opinion of a paper reviewer over the consistent, longitudinal findings of her treating physicians. (Doc. 17, p. 11, ¶ 50). This selective reliance, she argues, deprives Reliance's decision of substantial evidentiary support and renders the denial arbitrary and capricious. (Doc. 17, p. 11, ¶ 50).

The administrative record does not establish that Ms. Edwards was unable to perform the material duties of her regular occupation during the Elimination Period. Dr. Erdos noted:

> Documentation provided within the available medical records does not provide findings that support the severity of psychiatric symptoms that would result in functional limitations sufficient to preclude working as of 03/31/2022.
>
> Documentation in the records reflects that [Ms. Edwards] [w]as receiving outpatient counseling services for anxiety and depression between the dates of 03/31/2022 to 06/26/2023. These services appear to have occurred at a frequency of monthly to every two weeks and were treatment of anxiety and depression. Within the context of these ongoing progress notes, [Ms. Edwards] is consistently noted to be alert, oriented x3 with euthymic mood, congruent affect, and no indication of suicidal or homicidal ideation. [Ms. Edwards] reports poor sleep, poor appetite, poor to fair memory and concentration and moderate to high anxiety. While these findings demonstrate evidence of [Ms. Edwards] experiencing psychiatric symptoms, they do not document the presence of these symptoms at a level of severity that would be considered functionally limiting. Additionally, the intensity and frequency of treatment service provided to [Ms. Edwards] is not typical or consistent with an individual who might be experiencing impairing psychiatric symptoms.

(Doc. 11-2, p. 192).[2]

Although the administrative record reflects that Ms. Edwards attended counseling and reported symptoms of anxiety and depression, contemporaneous

---

[2] Dr. Erdos's statement that the progress notes consistently described Ms. Edwards as "euthymic" (normal mood) is incorrect. Instead, the progress notes consistently described Ms. Edwards as "dysthymic" (depressed mood). (Doc. 11-2, pp. 43–115, 147–75). Elsewhere in his report, Dr. Erdos correctly stated that Ms. Edwards "is consistently noted to be . . . with dysthymic mood." (Doc. 11-2, p. 186).

treatment notes do not document functional limitations severe enough to preclude her from performing her duties as a Clinical Nurse II. (Doc 11-2, p. 192). The record describes those duties as including administering prescribed medications and treatments in accordance with approved nursing techniques, as well as preparing equipment and assisting physicians during patient examinations and procedures. (Doc. 11-2, p. 196).

Ms. Edwards has not explained how her reported psychiatric symptoms would prevent her from performing these responsibilities. In Ms. Joyce's file review, she states that there is "[n]o indication of any restrictions or limitations for activities of daily living, such as caring for self and others, driving, and or making financial/legal decisions, which requires sustained attention, concentration, reasoning skills, and emotional regulation." (Doc. 11-1, pp. 54, 55–57, 59, 162–63). Consistent with this assessment, Dr. Erdos stated that "[Ms. Edwards] is consistently noted to be alert and oriented X3, . . . [with] no suicidal or homicidal ideation," the progress notes make "[n]o mention of medications," and "the intensity and frequency of treatment services provided to [Ms. Edwards] is not typical or consistent with an individual who might be experiencing impairing psychiatric symptoms." (Doc. 11-2, pp. 186–87). Overall, Ms. Edwards's course of treatment does not reflect psychiatric symptoms of a severity that would be expected to impair her ability to work as a Clinical Nurse II. Indeed, in her April 19, 2023 note regarding her visit with Ms.

Edwards, Dr. Smith wrote that Ms. Edwards did not feel that she could return to work with her employer and asked whether Ms. Edwards had "considered other places of employment?" (Doc. 11-2, p. 150).

Contrary to Ms. Edwards's argument, Reliance did not have to give greater weight to her treating physicians' records than Dr. Erdos's assessment because Ms. Edwards's diagnoses rest on her subjective complaints. "[T]he administrator is not required to accord deference to the opinions of treating physicians, or to credit treating physicians' opinions that are based upon the claimant's subjective complaints." *Howard v. Hartford Life & Acc. Ins. Co.*, 929 F. Supp. 2d 1264, 1294 (M.D. Fla. 2013), *aff'd*, 563 Fed. Appx. 658 (11th Cir. 2014); *see also Blankenship,* 644 F.3d at 1356 ("Plan administrators need not accord extra respect to the opinions of a claimant's treating physicians"); *Townsend v. Delta Family–Care Disability and Survivorship Plan,* 295 Fed. Appx. 971, 978 (11th Cir. 2008) ("[P]lan administrators are not required to give greater weight to the submissions of a treating physician than to other reliable evidence.").

Ms. Edwards's records from Disability Counseling Services consist largely of subjective reports and generalized observations, without accompanying objective assessments of cognitive functioning, concentration, memory, or decision-making. There is no evidence of formal psychological testing, standardized functional capacity evaluations, or detailed restrictions from a treating provider specifying that

Ms. Edwards could not perform the essential duties of her occupation. The records do not reflect significant impairments in activities of daily living, self-care, or interpersonal functioning that would reasonably translate into an inability to work in a clinical setting.

"[W]here the plan puts the burden on the claimant to prove that she is disabled, it is implicit in the requirement of proof that the evidence be objective." *Watts v. BellSouth Telecomms., Inc.*, 218 Fed. Appx. 854, 856 (11th Cir. 2007). Neuropsychological testing could have assisted in determining whether Ms. Edwards's conditions were causing functional impairment. No such testing appears in the record. The record does not reflect that Ms. Edwards was prescribed medication for these conditions during the Elimination Period. The limited number of treatment sessions suggests a non-severe impairment.

This absence of objective evidence, coupled with the absence of work restrictions during the Elimination Period, undermines Ms. Edwards's ability to establish her entitlement to benefits. *See Glazer*, 524 F.3d at 1247. Reliance's reviewing consultant concluded that the medical evidence did not support disabling psychiatric limitations, and nothing in the record persuasively contradicts that assessment.

Ms. Edwards argues that Reliance operates under a conflict of interest because Reliance determines her eligibility and simultaneously is responsible for disbursing

the funds. (Doc. 17, p. 13, ¶ 58). The Supreme Court has ruled that when an insurance company determines employee eligibility for benefits and disburses payments from its own fund, "this dual role creates a conflict of interest[] that a reviewing court should consider . . . as a factor in determining whether the plan administrator has abused its discretion in denying benefits; . . . the significance of the factor will depend upon the circumstances of the particular case." *Metro. Life Ins. Co.*, 554 U.S. at 108. Even if a conflict exists, "the burden remains on the plaintiff to show the decision was arbitrary; it is not the defendant's burden to prove its decision was not tainted by self-interest." *Doyle v. Liberty Life Assur. Co. of Boston,* 542 F.3d 1352, 1360 (11th Cir. 2008).

Here, even if Reliance operated under a structural conflict of interest, that factor does not alter the outcome. Ms. Edwards has not identified evidence showing that the alleged conflict improperly influenced Reliance's decision-making process. See *Doyle*, 542 F.3d at 1360. Instead, Reliance based its decision on the lack of objective evidence in the administrative record and Dr. Erdos's opinion that Ms. Edwards did not exhibit functional limitations rising to the level of total disability during the Elimination Period.

Ms. Edwards contends that "Reliance dismissed the detailed records of [her] treating providers as 'unsupported' without seeking clarification or requesting further testing." (Doc. 20, pp. 16–17, ¶ 43). After preparing his report, Dr. Erdos

attempted to contact Ms. Viveros to discuss Ms. Edwards's condition, but Ms. Viveros did not respond. (Doc. 11-2, p. 186).

Reliance's dependence on a file review does not, standing alone, render its decision incorrect. The question is not whether additional evidence might have supported Ms. Edwards's claim, but whether the evidence that was before the administrator established that Ms. Edwards was totally disabled within the meaning of the Policy during the Elimination Period.

Because the Court concludes that Reliance's decision was not wrong, the inquiry ends at the first step of the *Blankenship* framework. The record reflects that Reliance had reasonable objective grounds for its decision, and Ms. Edwards has not met her burden of showing that the denial was wrong.

***

Based on the Court's *de novo* review, the records and evidence do not establish that Ms. Edwards met the definition of "total disability" or "totally disabled" as that term is defined in the Reliance policy. Accordingly, the Court grants Reliance's motion for summary judgment, (Doc. 15), and denies Ms. Edwards's motion for summary judgment, (Doc. 16). The Clerk of the Court shall please TERM Docs. 15 and 16. The Court will enter a final judgment.

**DONE** and **ORDERED** this September 30, 2026.

**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE